No. 15-2198

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

WINFRED MUCHIRA,

*Plaintiff-Appellant*,

*v.*

HALAH AL-RAWAF, IBRAHIM AL-RASHOUDI,
FAHAD AL-RASHOUDI, LULUH AL-RASHOUDI

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Virginia
No. 1:14-cv-00770-AJT-JFA (Trenga, J.)

## BRIEF FOR PLAINTIFF-APPELLANT

JAMES L. QUARLES III
GREGORY H. LANTIER
ROBERT ARCAMONA
THOMAS G. SPRANKLING
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue N.W.
Washington, D.C.  20006
(202) 663-6000

December 11, 2015

## CORPORATE DISCLOSURE STATEMENT

As a natural person, Ms. Muchira has no parent corporation and does not issue stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ...............................................................iv

PRELIMINARY STATEMENT ...............................................................1

JURISDICTIONAL STATEMENT ...........................................................4

ISSUES PRESENTED...................................................................4

STATEMENT .........................................................................5

    A.    Ms. Muchira's Background ..............................................5

    B.    Working Conditions In The United States ...............................7

    C.    The Escape ..........................................................11

    D.    District Court Proceedings ...........................................13

SUMMARY OF ARGUMENT ...............................................................20

ARGUMENT ..........................................................................22

I.    THE DISTRICT COURT ERRED BY IGNORING MS. MUCHIRA'S BACKGROUND AND EXPERIENCES WHEN DETERMINING WHETHER HER LABOR WAS PROCURED VIA "SERIOUS HARM" IN VIOLATION OF 18 U.S.C. § 1589................................................................22

    A.    Section 1589's Plain Text And Legislative History Makes Clear—And Every Circuit Court To Even Touch On The Issue Has Recognized—That A Factfinder Must Conduct An Individualized Inquiry Into A Victim's Special Vulnerabilities ......................................................22

    B.    The District Court Erred By Reciting And Applying An Incorrect Legal Test For Determining Whether Ms. Muchira Suffered, Or Faced Threats Of, Serious Harm .........................28

    C.    Under The Proper Legal Standard, Ms. Muchira's § 1589 Claims, And Those Claims Dependent On A § 1589 Violation, Survive Summary Judgment ...............................................35

II.    THE DISTRICT COURT MISAPPLIED THE SUMMARY JUDGMENT STANDARD BY WEIGHING THE EVIDENCE AND FAILING TO ANALYZE THE FACTS IN THE LIGHT MOST FAVORABLE TO MS. MUCHIRA ...............................................39

    A.    The Procedural Posture Of This Case Required The District Court To View The Facts In The Light Most Favorable To Ms. Muchira And Avoid Weighing The Evidence ............................40

    B.    The District Court Failed To Apply The Proper Standard; It Improperly Decided Factual Issues And Failed To Weigh The Evidence In The Light Most Favorable To Ms. Muchira ............40

        1.    Ms. Muchira presented evidence showing that she continued working for Defendants due to serious harm in the form of psychological coercion ......................................41

        2.    Ms. Muchira put forth evidence that she continued working for Defendants due to their implicit threat she would be arrested if she left......................................45

        3.    Ms. Muchira put forth evidence showing that Defendants procured her labor through abuse of the visa process ...............................................47

CONCLUSION ...............................................51

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................40

*Antonatos v. Waraich*, No. 12-cv-01905, 2013 WL 4523792 (D.S.C. Aug. 27, 2013) ..................................................................28

*Cruz v. Maypa*, 773 F.3d 138 (4th Cir. 2014) ..................................................25, 26

*Elat v. Ngoubene*, 993 F. Supp. 2d 497 (D. Md. 2014) ..............................27, 33, 34

*Jacobs v. North Carolina Administrative Office of the Courts*, 780 F.3d 562 (4th Cir. 2015) ..................................................39

*Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005) ......................................17

*Joseph v. Signal International L.L.C.*, No. 13-cv-324, 2015 WL 1262286 (E.D. Tex. Mar. 17, 2015) .........................................23

*Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107 (D.D.C. 2012) ....................................22

*Maersk Line, Ltd. v. United States*, 513 F.3d 418 (4th Cir. 2008) .........................29

*McAirlands, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307 (4th Cir. 2014) ..................................................................40

*Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144 (4th Cir. 2012) ..........................39

*Tolan v. Cotton*, 134 S. Ct. 1861 (2014) ................................................................40

*United States v. Afolabi*, 508 F. App'x 111 (3d Cir. 2013) .....................................27

*United States v. Booker*, 655 F.2d 562 (4th Cir. 1981) .....................................29, 30

*United States v. Bradley*, 390 F.3d 145 (1st Cir. 2004) .....................................28, 30

*United States v. Calimlim*, 538 F.3d 706 (7th Cir. 2008) ...........................25, 28, 31

*United States v. Callahan*, 801 F.3d 606 (6th Cir. 2015) ...................................2, 24

*United States v. Dann*, 652 F.3d 1160 (9th Cir. 2011) ......................................27, 31

*United States v. Farrell*, 563 F.3d 364 (8th Cir. 2009) .....................................28, 30

*United States v. Kalu*, 791 F.3d 1194 (10th Cir. 2015) ...........................................27

*United States v. Kozminski*, 487 U.S. 931 (1988)...............................................17, 24

*United States v. Rivera*, 799 F.3d 180 (2d Cir. 2015) ...........................................27

*United States v. Toviave*, 761 F.3d 623 (6th Cir. 2014) .........................................26

## STATUTES AND RULES

18 U.S.C.
       § 1581 .........................................................................................28
       § 1583 ...................................................................................22, 30
       § 1584 ..........................................................................13, 17, 30
       § 1585 .........................................................................................22
       § 1588 .........................................................................................22
       § 1589 ...................................................................................*passim*
       § 1590 ...................................................................................13, 39
       § 1592 ...................................................................................13, 39
       § 1593A .................................................................................13, 39
       § 1595 ...............................................................................4, 13, 39

28 U.S.C.
       § 1291 ...........................................................................................4
       § 1331 ...........................................................................................4
       § 1367 ...........................................................................................4

Act of June 25, 1948, ch. 645, 62 Stat. 683 ...........................................18

Fair Labor Standards Act, 29 U.S.C. § 216 ......................................4, 13

Pub. L. No. 110-457, 122 Stat. 5044 (2008)...........................................23

Pub. L. No. 106-386, 114 Stat. 1464 (2000)................................18, 22, 25

Fed. R. Civ. P. 56(a).......................................................................40

## LEGISLATIVE MATERIALS

154 Cong. Rec. H10,904 (daily ed. Dec. 10, 2008)................................24

H.R. Conf. Rep. No. 106-939 (2000)................................................24, 25

H.R. Rep. No. 106-487 (1999)...................................................................25

## OTHER AUTHORITIES

Kim, Kathleen, *The Coercion of Trafficked Workers*, 96 Iowa L. Rev. 409 (2011)...................................................................................25

Reese, Benjamin, Note, *Holding on to Clarity*, 114 Mich. L. Rev. 275 (2015)........................................................................................25

Siskin, Alison & Liana S. Wyler, Congressional Research Service, RL34319, *Trafficking in Persons* (2013)......................................22

## PRELIMINARY STATEMENT

Ms. Muchira came to the United States with many of the vulnerabilities typical to a recent immigrant, including a precarious legal status, difficulty speaking and understanding English, no support network of friends and family, and virtually no knowledge of U.S. law. But she also came with additional vulnerabilities, including having been groomed to be a "housegirl" in Saudi Arabia, where she was not permitted to sit down, to break from work, or to talk to anyone without express permission from the Saudi Arabian family that employed her.

In July 2012, Ms. Muchira entered the United States on a limited visa that permitted her to remain in the country so long as she worked for Defendants. She qualified for this visa only because she followed Defendants' instructions to lie and tell the U.S. government she would receive many times the salary Defendants actually planned to pay and because Defendants showed the U.S. government a contract under which they falsely represented that, among other things, they would treat Ms. Muchira humanely, permit her to leave their residence after working hours, and let her keep her passport.

Once she was in the United States, Defendants took advantage of Ms. Muchira's situation and compelled her to work nearly one-hundred hours a week for less than $1 an hour for the greater part of a year. They took possession of her

passport shortly after she landed at Dulles Airport, and did not return it until after she ultimately fled from their house with the help of local police. They prohibited her from talking to neighbors. They did not permit her to leave their residence unaccompanied (except to take out the garbage). They monitored her every movement. And if Ms. Muchira ever failed to cater to Defendants' whims, they verbally abused her.

Ms. Muchira ultimately filed this civil suit against Defendants, accusing them of, *inter alia*, forced labor violations under 18 U.S.C. § 1589. That statute prohibits compelling a person to work "by means of serious harm or threats of serious harm," and defines "harm" broadly to mean "*any* harm … including psychological, financial or reputational harm, that is sufficiently serious, under all surrounding circumstances, to *compel a reasonable person of the same background* and in the same circumstances to perform or continue performing labor or services." 18 U.S.C. § 1589(a), (c) (emphases added); *see United States v. Callahan*, 801 F.3d 606, 618 (6th Cir. 2015) (recognizing that "§ 1589 prosecutions typically target those who exploit the unique vulnerabilities of foreign-born victims"). Upon receiving Ms. Muchira's complaint, Defendants fled the country and refused to return under any circumstances, even to be deposed, because they knew they would be arrested if they did.

When fleeing the country did not help them avoid Ms. Muchira's civil suit, Defendants filed a motion to dismiss on numerous procedural grounds and for failure to state a claim. The motion was denied in its entirety and has not been cross-appealed.

Defendants subsequently switched tacks, and sought to shift blame to the victim of their misconduct. For example, they filed a motion for sanctions, requesting that Ms. Muchira's case be dismissed for failure to turn over certain information from her social media and email accounts. Once again, the motion was denied and has not been cross-appealed. Later, Defendants moved for summary judgment on virtually all of Ms. Muchira's claims, again relying primarily on a blame-the-victim strategy; namely, that Ms. Muchira had not been physically forced to accompany Defendants to the United States and thus was barred as a matter of law from challenging Defendants' controlling, abusive, and unlawful conduct.

Weeks before trial, the district court granted Defendants' summary judgment motion on a subset of Ms. Muchira's claims, including her § 1589 allegations. The district court's analysis failed to follow the statute's requirement to consider the harm Ms. Muchira suffered from the perspective of a reasonable foreign national with the same background and under the same circumstances as Ms. Muchira. Instead, the court imposed a novel test drawn entirely from an inapposite case that

interpreted a *different statute* and that has not been cited by this Court for any reason since 1983. The district court compounded this error by misapplying the summary judgment standard by finding in favor of Defendants on several factual issues. The first error presents a question of the first impression for this Court; either provides sufficient grounds to reverse the district court's ruling.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1367; 29 U.S.C. § 216(b); and 18 U.S.C. § 1595(a). The district court entered final judgment on September 11, 2015. JA1063. Ms. Muchira filed a notice of appeal on October 8, 2015. JA1064-1065. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

Whether the district court erred by:

1.     Entirely ignoring the requirement—established by 18 U.S.C. § 1589(c)(2)—to consider Ms. Muchira's background and experiences when determining whether Defendants violated § 1589's prohibition on forced labor by coercing her into working for them as their housemaid for nearly a year at a rate of less than $1 an hour.

2.     Fundamentally misapplying the summary judgment standard by construing the facts in the light most favorable to Defendants and weighing the evidence.

- 4 -

## STATEMENT

### A.    Ms. Muchira's Background

Ms. Muchira grew up in poverty in a small Kenyan village alongside seven brothers and sisters.  JA927 ¶¶ 7-8.  Due to that poverty, she was forced to leave school after eighth grade.  JA927-928 ¶¶ 8-11, 14.  She began working as a housemaid, first for private families and ultimately for a hotel.  JA928-929 ¶ 15.  When she subsequently lost her job at the hotel, she was taken in by one of her sisters.  *Id.*

It was at this desperate point that Ms. Muchira's pastor told her about an opening for a job working as a housemaid for a Saudi Arabian family.  JA929 ¶ 16.  Ms. Muchira subsequently signed a contract to work for Defendants that promised a salary of roughly $350 a month.  JA930 ¶ 19.  After arranging the job, however, the pastor demanded a payment equal to one-and-a-half month's salary to cover what he called "processing costs."  *Id.* ¶ 20.

Ms. Muchira traveled to Saudi Arabia in 2010.  JA930 ¶ 22.  When she arrived, Defendants' family immediately confiscated her passport and put her to work cleaning and cooking for three different family members' households.  JA931-932 ¶¶ 23, 26-27; JA236:5-237:3; JA237:19-238:6.  From that time forward, Ms. Muchira did not have a moment's rest.  JA932 ¶¶ 27-31.  The family required her to work night and day—until she was dizzy from lack of sleep—and

paid her substantially less money than promised.  JA931-932 ¶¶ 25-26, 31.  The

family also enforced a draconian set of rules.  *See, e.g.*, JA931-933 ¶¶ 26-28, 31,

33-34.  Ms. Muchira and the other housemaids were not permitted to sit down; to

take days off or breaks of any kind; or to talk to anyone, including each other.

JA932-934 ¶¶ 28, 31, 33, 36.  Ms. Muchira's employers screamed at her when she

failed to follow these rules and sometimes denied her food.  JA932-933 ¶¶ 30, 33.

The fear of being a runaway Kenyan woman in Saudi Arabia and of the

consequences of breaking her contract kept Ms. Muchira from leaving.  JA932-933

¶¶ 32, 34.

During this time, Ms. Muchira briefly returned to Kenya in May 2012 to

visit her sick mother.  JA934 ¶ 37.  While she was there, Defendants requested that

she return to serve as their housegirl in the United States while some of Defendants

attended private colleges here.  Ms. Muchira returned to Saudi Arabia to

accompany the Saudi family to the United States.[1]

In a written contract subsequently provided to the U.S. State Department in

order to gain entry to the United States, Defendants promised, among other things,

---

[1]     Defendants left Ms. Muchira with three options: she could (1) complete her
contract in Saudi Arabia, where she had been sorely mistreated, (2) break her
contract by staying in Kenya, leaving her with little means to support her family
and facing a potential backlash from her pastor, or (3) travel with Defendants to the
United States, where she was promised a higher wage, reasonable working hours,
and "fair and humane" treatment.  Taking the job in the United States was the only
reasonable decision for a person in her position.

that: (1) Ms. Muchira would be paid $10 an hour for forty hours of work a week (i.e., $1,600 a month), (2) Defendants would be responsible for her room, board, medical costs, and transportation to and from the United States, and (3) Defendants would neither "ask [her] to remain" in their residence "after working hours without compensation" nor "withhold [her] passport." JA790-792. The contract also provided that Defendants would "undertake to treat [Ms. Muchira] in a fair and humane way." *Id.*

The contract was a fiction. Defendants subsequently informed Ms. Muchira that they would pay her only $400 a month, but instructed her to lie to U.S. embassy officials during her visa interview and tell them that she would be paid the $1,600 promised by the contract. JA304:9-11; JA540:11-21. At the embassy interview, one official gave her a pamphlet with a hotline number to call if she was mistreated. JA935-936 ¶ 46. Ms. Muchira accepted the pamphlet, but kept it hidden from the Saudi family because she knew that Defendants would confiscate the moment they saw it. *Id.*

## B. Working Conditions In The United States

Upon arrival at Dulles Airport, Defendants immediately took Ms. Muchira's passport; that was the last time she possessed it during her captivity in the United States. JA938 ¶ 58; JA235:7-237:18; JA238:7-12, 16-19. She was only allowed to

use it to transfer her wages to her family in Kenya on a handful of occasions, always accompanied by a member of Defendants' family. JA238:16-19.

Defendants also continued to impose "house rules" similar to those in Saudi Arabia. JA244:11-247:3; JA254:4-12; JA321:1-19. Once again, Ms. Muchira was prohibited from speaking to neighbors. JA313:18-314:3. She was also not permitted to sit on the furniture. JA937 ¶ 53; JA289:5-294:21.

Further, Ms. Muchira was regularly required to work long, 15-hour days with no time off. JA937 ¶ 53. If Ms. Muchira did not follow these rules, Defendants verbally abused her. JA269:17-276:4. And, given her salary of $400 a month, Ms. Muchira's effective pay rate was less than $1 per hour.

Defendants monitored and controlled Ms. Muchira's movements. JA 936-937 ¶¶ 50-52. She was told not to leave Defendants' residence unless accompanied by a family member and, in her eight months with Defendants, she never violated this rule. JA937 ¶ 52; JA244:11-247:3; JA316:8-18; JA317:4-9; JA318:20-319:4; JA321:4-8, 12-19. When Defendants and Ms. Muchira first came to the country, they slept in separate (but nearby) apartments in a small, enclosed apartment complex; to ensure that Ms. Muchira did not leave the premises, Ms. Al-Rawaf called her every night. JA118-119. When Defendants later moved to a house in Vienna, Virginia, they set up a house alarm system to go off every time the door was opened and did not give Ms. Muchira the code. JA147-151; JA937 ¶

51; JA323:22-324:20.  The only time that Ms. Muchira was allowed off the

property alone was when she took out the garbage.  JA936-937 ¶ 50.  Even this

was done under Defendants' constant surveillance.  *Id.*

Ms. Muchira's primary connection to the outside world was the cell phone

that Defendants gave her so that they could call her when needed.  JA940 ¶ 65.

Defendants used the phone as another means to control Ms. Muchira.  *Id.*  If the

family wanted something after Ms. Muchira went to bed, they would call her and

she would have to return to work.  *Id.*  Defendants also used the phone to keep tabs

on Ms. Muchira when they were away from home.  *Id.*  Ms. Muchira occasionally

used the phone to speak with her mother and sister in Kenya.  JA940-941 ¶ 66.

Her family was "happy and proud" that she had reached the United States and,

knowing they could not help her, Ms. Muchira did not tell them about the realities

of her "miserable situation."  *Id.*

She also used the phone to access Facebook, where she kept up a charade

that she was living a good life in America.  *See, e.g.*, JA407:13-408:8; JA417:15-

420:5; JA431:4-22; JA485:11-487:18.  She was too ashamed to tell her friends and

family anything different and was aware that Defendants could view many of her

Facebook postings.  *E.g.*, JA366:21-369:8; JA416:16-417:10.  Rather than using

Facebook to detail the realities of her living situation, then, Ms. Muchira used the

platform as a type of escapism.  For example, she corresponded with a number of

"boyfriends" in Nigeria (none of whom she has ever met) during her eight months

with Defendants, each of whom approached her online after they learned of her

apparent good fortune in the United States. *E.g.*, JA720:3-13 ("[Mr. Elvis] wanted

to get money from me so he was trying to sweet talk to me"); JA720:3-721:5

(testifying that four men had told Ms. Muchira they "wanted to marry" her but that

all "were trying to get something from me, [which] you can see in my messages")).

She fantasized about marriage. *E.g.*, JA840. And she meticulously curated the

rare glimpses she received of the outside world, in one instance making eight

different posts depicting a single trip to a Georgetown ice rink where she was

permitted to watch the skaters under Defendants' close supervision. *See* JA844-

847 (photos of the rink with captions including "@ WINNIE STRESS FREE

TIMES," "Wow moments," and "Funn funn")); *see infra* p. 44.

Defendants' words and behavior terrified Ms. Muchira. JA937 ¶ 51; JA

941-942 ¶ 70. She forced herself to continue working punishing hours despite

utter exhaustion and a dislocated back, because she feared how Defendants would

react if she did not keep the schedule they set. JA939-940 ¶¶ 61-62. She had

difficulty sleeping, routinely cried herself to sleep at night, and eventually

developed both a major depressive disorder and Acute Stress Disorder with Panic

Attacks. JA940 ¶ 63; JA991-994; JA823:6-824:13. But for most of her time with

Defendants, she did not seriously consider the possibility of escaping. JA940 ¶ 63;

JA 941-942 ¶ 70.  She had seen the family mistreat many others and felt she would be in great danger if Defendants thought she was going to try to leave.  JA 940 ¶ 63; JA941-942 ¶¶ 70, 73.

Ms. Muchira began counting the days until her six-month visa would expire, believing that Defendants would then "have to let [her] go."  JA939 ¶ 60. However, as that time approached, Ms. Muchira noticed Defendants Ms. Al-Rawaf and Fahad Al-Rashoudi taking Ms. Muchira's passport out of the house multiple times.  *Id.*  They later informed her that they had filed the necessary paperwork to extend the length of her visa and that they also were extending the length of her contract.  *Id.*; JA220:16-221:7; JA229:7-232:9.  Ms. Muchira was not given a copy of the new contract, which once again represented a rate of $1,600 per month and reasonable working hours.  *See* JA229:2-234:1; JA696:8-16; JA951-952.

### C.    The Escape

Around that time, Ms. Muchira received her first call from Ms. Rose Ngigi, who was from Ms. Muchira's small village in Kenya and who had since moved to Alabama with her husband.  JA941 ¶ 68.  Ms. Muchira's mother had asked Ms. Ngigi to contact Ms. Muchira so that both women would have a friend in America, and over time, Ms. Ngigi became a trusted confidant.  *Id.*  Ms. Muchira hid these phone calls from Defendants by telling Ms. Ngigi to call her late at night and by

speaking to her in a low whisper in their native language.  JA941 ¶ 69; JA329:2-331:15.

Ms. Muchira ultimately confided in Ms. Ngigi about the truth of her living situation and Ms. Ngigi pushed her to find some means of escape.  JA941-942 ¶¶ 69-70, 72.  Ms. Muchira recalled the anti-trafficking hotline number the U.S. Embassy gave her during her initial visa interview.  JA942 ¶ 72.  Although scared of what Defendants might do if they found out, she called the hotline.  *Id.* ¶¶ 72-73.

Hotline operators tried to reach Ms. Muchira nine times after the first call.  JA203:17-213:20; JA953-969.  She refused to speak with them during the day and told them not to come to Defendants' house or contact the Saudi family unless they helped her escape first.  JA942 ¶ 73.  Sometime after Ms. Muchira first asked for help from the anti-trafficking organization, Defendants left on a brief vacation.  *Id.* ¶ 74.  The hotline contacted Detective William Woolf of the Fairfax County human trafficking taskforce, who in turn called Ms. Muchira to let her know that he and another police officer were on their way to rescue her.  JA943 ¶¶ 74-75.  After reassurances from Detective Woolf that she would not be arrested or harmed, Ms. Muchira gathered her belongings and tidied the house (e.g., hanging and folding laundry) so that Defendants would be less upset at her when they returned.  JA808:22-811:15; JA943 ¶¶ 74-76.  She was "shaking" when she opened the house's front door to meet Detective Woolf.  JA944 ¶¶ 78-79.  The house alarm

immediately went off and soon after her phone rang—Defendants were calling to find her. *Id.* ¶¶ 79-80. At Detective Woolf's instruction that it was for her own safety, Ms. Muchira did not answer the phone. JA821:5-11.[2]

### D.   District Court Proceedings

After her escape, Ms. Muchira found pro bono legal counsel through the assistance of others. On February 23, 2014, she filed a complaint in the Eastern District of Virginia pursuant to 18 U.S.C. § 1595(a), which permits a victim of trafficking offenses prohibited under chapter 77 of title 18—such as forced labor, *see* 18 U.S.C. § 1589(a)—to bring "a civil action against the perpetrator." *See* JA18 ¶ 5. Ms. Muchira alleged that Defendants had violated numerous federal and state laws by bringing her to the United States "for purposes of involuntary servitude and forced labor in their home in Virginia." JA17 ¶ 1.[3]

---

[2]     After an investigation, the State Department certified that Ms. Muchira was a victim of a severe form of human trafficking, and granted her special dispensation to stay in the country. *See* JA41-43; JA1039 n.14.

[3]     Specifically, Ms. Muchira alleged that Defendants violated 18 U.S.C. § 1584 (involuntary servitude); § 1590 (trafficking with respect to peonage, slavery, involuntary servitude, or forced labor); § 1589 (forced labor); § 1592 (unlawful conduct with respect to an immigration-related document (such as knowing possession of a passport)); and §§ 1593A, 1595 (benefiting from a violation of §§ 1589, 1592, and/or 1595(a)). JA29-33. She also brought a claim under the Fair Labor Standards Act, 29 U.S.C. § 216, as well as state law civil conspiracy, unjust enrichment, false imprisonment, intentional infliction of emotional distress, and punitive damages claims, JA33-37.

Following service of the complaint, Defendants left the country. *E.g.*, JA86:24-87:3. They refused to return to be deposed, although they did choose to appear at several litigation-related meetings via video conference. *See* JA196:21-197:12 (Ms. Muchira's counsel noting that Defendants appeared at Ms. Muchira's deposition "on a giant screen approximately [ten] feet by six feet that is set up at the direct opposite end of the table from the witness"). They soon filed a motion to dismiss for lack of subject matter jurisdiction, personal jurisdiction, and proper service, as well as for failure to state a claim. Dkt. 16 at 1-2. Ruling from the bench, the district court rejected the motion to dismiss in its entirety. *See* JA63-64. The court explained, among other things, that Ms. Muchira's "allegations as a whole are sufficient to make her claims plausible as to each of the defendants." JA64.

Defendants did not offer any evidence or testimony of their own in response to Ms. Muchira's allegations. Instead, acting through counsel, they accused Ms. Muchira of, among other things, intentionally losing access to her cell phone and of hiding documents to avoid having to comply with a broad discovery request for "[a]ll social media and electronic messages and/or postings sent by Plaintiff … from July 28, 2012, to and including April 1, 2013." Dkt. 139 at 2-3. Defendants spent months pursuing severe sanctions—including dismissal of Ms. Muchira's

case—on the grounds that she had failed to comply with discovery obligations. *See generally* Dkts. 73, 129.

The reality was not close to what Defendants alleged. Ms. Muchira lost access to a number of her online accounts primarily because—due to a lack of technological sophistication—she had failed to store, and did not remember, her log-in information. Dkt. 139 at 5-7. Every time she had trouble accessing an account, she had simply created a new one or asked someone to create an account for her. *Id.*[4] Ultimately, after months of effort, Ms. Muchira and her counsel retrieved and produced all but a small fraction of the information from her online accounts. *Id.* at 7-12.

Defendants' sanctions motions were referred to Magistrate Judge Anderson, who ultimately (and correctly) declined to impose any penalty. JA1027-1028 ("You know, I think that the plaintiff has made good faith efforts [to turn over the material]. I think it's been difficult. … [T]his really isn't a case that justifies either terminating sanctions, or at the beginning of the case any instruction to the jury[.]").

---

[4]    As Ms. Muchira explained: "[W]hen I lost the password, I had a habit of dropping those if they don't work out, drop and make a new one, drop and make one – a new one. That's why you see myself appearing in many accounts which are no password or first I – I log in the password and I forgot." Dkt. 139 at 6; *see also id.* at 7 ("[S]ometimes my phones broke or I missed the password. That's why you can see me having many many accounts while they are not operating.").

Defendants also filed a motion requesting summary judgment in their favor on all of Ms. Muchira's claims except for her Fair Labor Standards Act claim against Defendant Halah Al-Rawaf. Dkts. 125-126. Defendants identified virtually no affirmative evidence supporting this motion for partial summary judgment. Instead, they mainly based the motion on two facts discussed during Ms. Muchira's depositions.[5] *First*, Ms. Muchira was neither physically forced to come to the United States nor physically abused after she arrived. *Second*, Ms. Muchira used Facebook to present a happy face to the outside world during the eight months she worked for Defendants in the United States. *See* Dkt. 126. Defendants recognized that a district court ruling on a summary judgment motion generally must leave credibility determinations to the jury, but urged the court to adopt a narrow exception to this rule that permits a district court to make "some assessment of the plaintiff's" credibility "in the rare circumstance" where: (1) "the plaintiff relies almost exclusively on his own testimony" and (2) "much of [the testimony] is contradictory and incomplete," although "the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor."

---

[5]    Because Ms. Muchira is not a native English speaker, she had some difficulty grasping and responding to Defendants' deposition questions. For example, she consistently mixed up gender pronouns, referring to men as "her" and women as "him." *See, e.g.*, JA275:16-19; JA317:2-3; JA417:4-14; JA435:11-14; JA440:7-19; JA442:3-9. Ms. Muchira was scheduled to have a translator at trial.

*Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005); *see also* Dkt. 126 at 16-17.

The district court granted partial summary judgment three weeks before trial. *See* JA1059.  Although the court concluded Ms. Muchira had raised a genuine issue of material fact on her claims that involved whether she had been severely undercompensated for her time in Defendants' employ, it granted summary judgment on her human-trafficking related claims, as well as her false imprisonment, intentional infliction of emotional distress, and punitive damages claims.  *Id.*  Notably, the district court expressly declined to apply the *Jeffreys* doctrine, explaining that it would not engage in credibility determinations and was instead "bas[ing] its decision" solely "*on the undisputed aspects* of [Ms. Muchira's] testimony."  JA1040 n.15 (emphasis added).

The majority of Ms. Muchira's trafficking claims required her to demonstrate as a predicate that Defendants had violated either 18 U.S.C. § 1584, which prohibits involuntary servitude (i.e., physical or legal coercion, *see United States v. Kozminski*, 487 U.S. 931, 944 (1988)), or 18 U.S.C. § 1589, which prohibits forced labor (a term that encompasses any form of coercion, including via psychological harm).  *See* JA1041-1042.  Thus, in order to grant summary judgment, the district court grouped its discussion of §§ 1584 and 1589 in the same subsection even though (1) the two statutes criminalize different kinds of conduct

- 17 -

and (2) § 1589 was enacted years after § 1584 as part of the Trafficking Victims Protection Act of 2000 ("TVPA"), Pub. L. No. 106-386, 114 Stat. 1464, which recognized that "[e]xisting legislation and law enforcement in the United States … [is] inadequate to deter trafficking and bring traffickers to justice." *Id.* § 102(b)(14), 114 Stat. at 1467.[6]  Observing that Ms. Muchira "proffer[ed] essentially the same evidence in support of both claims," the district court blended its legal analysis for the two statutes. *See* JA1043-1049.  Specifically, it laid out a single test to determine whether either statute had been violated:  "[T]he critical inquiry … is whether a person provides those services free from a defendant's physical or psychological coercion that as a practical matter eliminates the ability to exercise free will or choice." JA1045.

The district court's analysis notably failed to discuss § 1589(c)(2), which makes clear that § 1589 prohibits forced labor procured by threat of, or due to suffering, "any harm … including psychological harm … that is sufficiently serious under all the surrounding circumstances to compel a reasonable person of the same background and in the same circumstances to perform or continue performing labor or services in order to avoid incurring that harm."  Nor did the

---

[6]     The district court mistakenly labeled Ms. Muchira's § 1584 allegation as one of Ms. Muchira's "TVPA claims," *see* JA1040, JA1045, despite the fact that the statute was codified in title 18 over a half-century before the TVPA was enacted, *see* Act of June 25, 1948, ch. 645, 62 Stat. 683, 773.

district court cite any § 1589 case law supporting its holding—or even acknowledge that different legal standards apply to § 1589 than to § 1584. Instead, the district court faulted Ms. Muchira for failing to present "objective evidence" that she was coerced into working for Defendants. JA1046. The court also failed to expressly consider any of the special circumstances surrounding Ms. Muchira's employment that would have made it difficult for her to leave, such as that she was a newly arrived immigrant in the United States who knew essentially no one other than her employers, had her passport confiscated, and believed she had to continue working for Defendants to avoid arrest. JA1044-1049.

Furthermore, although Defendants conceded that at least ***thirty facts*** that they themselves had highlighted as "material" to their summary judgment motion were disputed, Dkt. 140 at 4, the district court weighed the evidence and resolved each issue in favor of Defendants. For example, the parties disputed whether Ms. Muchira had been coerced into remaining in Defendants' employ after she arrived in the United States, the dispositive question for her § 1589 forced labor claim. *Compare* Dkt. 134 at 11-14, 27, *with* Dkt. 140 at 8-12. The district court found in Defendants' favor, JA1049, despite evidence from Ms. Muchira and four other witnesses supporting the conclusion that she had indeed been coerced into staying, *see infra* pp. 43-45. Relatedly, both sides heatedly disputed whether Ms. Muchira ever left Defendants' residence unaccompanied—an important issue for her § 1589

- 19 -

forced labor claim.  *Compare* Dkt. 134 at 4-5, 12 n.5, 15, 21-22, *with* Dkt. 140 at

4-5, 15-17.  Again, the district court found in Defendant's favor.  JA1051-1052.

*See also infra* pp. 43-45.

Following the district court's ruling, the parties resolved the claims that had

survived summary judgment and the district court entered final judgment on

September 11, 2015.  JA1063.  Ms. Muchira timely filed her notice of appeal

challenging the district court's summary judgment decision on October 8, 2015.

JA1064-1065.

## SUMMARY OF ARGUMENT

**I.**    The district court erred by both identifying and applying the wrong

legal standard for determining whether Ms. Muchira suffered "serious harm" under

18 U.S.C. § 1589.  The district court's analysis ignored the plain text of 18 U.S.C.

§ 1589(c)(2), which requires the factfinder to determine whether a victim was

compelled to work due to serious harm or a threat of serious harm by considering

whether "all the surrounding circumstances" would have forced "a reasonable

person of the same background and in the same circumstances" to continue

working.  Instead, the court invented a novel legal test that has not been adopted by

any other court and that was derived from a three-decade old case that interpreted

an entirely different statute.  As a result of this fundamental legal error, the district

court viewed the ample evidence presented by Ms. Muchira through the wrong

analytical lens and incorrectly concluded that she did not establish a genuine issue of material fact regarding whether Defendants violated 18 U.S.C. § 1589.

II.     The district court also committed legal error by misapplying the summary judgment standard, which is an independent reason for reversal.  As the Supreme Court recently affirmed, on summary judgment a court is required to view the facts in the light most favorable to the nonmoving party and may not weigh the evidence.  The district court in this case followed neither rule, an error that substantially prejudiced Ms. Muchira.  Specifically, Ms. Muchira presented ample evidence under the correct test that Defendants had caused her, or threatened, serious harm by exploiting her fear of arrest and employing psychological coercion to keep her under their control.  Additionally, under the proper standard, Ms. Muchira established that there was a genuine question of material fact regarding whether Defendants abused the visa process to force her to work for them.

# ARGUMENT

I.   **THE DISTRICT COURT ERRED BY IGNORING MS. MUCHIRA'S BACKGROUND AND EXPERIENCES WHEN DETERMINING WHETHER HER LABOR WAS PROCURED VIA "SERIOUS HARM" IN VIOLATION OF 18 U.S.C. § 1589**

A.   **Section 1589's Plain Text And Legislative History Makes Clear— And Every Circuit Court To Even Touch On The Issue Has Recognized—That A Factfinder Must Conduct An Individualized Inquiry Into A Victim's Special Vulnerabilities**

Section 1589 is part of the Trafficking Victims Protection Act of 2000

("TVPA"), Pub. L. No. 106-386, 114 Stat. 1464, which was enacted "to address

the increasingly subtle methods of traffickers who place their victims in modern-

day slavery, such as where traffickers … restrain their victims without physical

violence or injury, or threaten dire consequences by means other than overt

violence," *Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107, 115 (D.D.C. 2012).[7]  While

other sections in the same chapter of the U.S. Code prohibit crimes associated with

more traditional notions of slavery—*see, e.g.*, 18 U.S.C. § 1583 ("Enticement into

slavery"), § 1585 ("Seizure, detention, transportation or sale of slaves"), § 1588

("Transportation of slaves from United States")—§ 1589 criminalizes a more

insidious type of conduct:  using "forced labor."  The prohibition on "forced labor"

---

[7]     The TVPA is sometimes referred to as the "Victims of Trafficking and Violence Protection Act of 2000"; this is the name of the broader statute of which the TVPA is one part.  *See* Siskin & Wyler, Cong. Research Serv., RL34317, *Trafficking in Persons* summary (2013), *available at* https://www.fas.org/sgp/crs/row/RL34317.pdf

encompasses "knowingly … obtain[ing] the labor or services of a person by … means of serious harm or threats of serious harm to that person or another person." § 1589(a)(2).  The statute treats "serious harm" as a different (but equally illegal) category of coercion from procuring labor by "means of force … or physical restraint."  *Id.* § 1589(a); *see Joseph v. Signal Int'l L.L.C.*, No. 13-cv-324, 2015 WL 1262286, at *7-8 (E.D. Tex. Mar. 17, 2015).  Indeed, Congress amended the statute in 2008 to make clear that "serious harm" includes "*any* harm, whether physical or nonphysical, including psychological harm."  *See* Pub. L. No. 110-457, § 222, 122 Stat. 5044, 5070 (codified at 18 U.S.C. § 1589(c)(2)) (emphasis added). Furthermore, when considering whether the victim suffered, or was threatened with, serious harm, the same 2008 amendment mandates that the factfinder consider the special characteristics of the victim.  As the amended statute reads, whether the victim suffered "sufficiently serious" harm is determined by considering whether, "*under all the surrounding circumstances*, [the harm would have] compel[led] a reasonable person *of the same background and in the same circumstances* to perform or to continue performing labor or services in order to avoid incurring that harm."  *Id.* (emphases added).

The TVPA's legislative history confirms that Congress intended the factfinder to consider the special characteristics of a victim when determining whether the victim suffered or was threatened with serious harm.  Congress

explained when enacting the original version of the TVPA that the law should be "construed with respect to the individual circumstances of victims that are relevant in determining whether a particular type or certain degree of harm or coercion is sufficient to maintain or obtain a victim's labor or services."  H.R. Conf. Rep. No. 106-939, at 101 (2000).  And according to a joint explanatory statement by then-chairs of the House Judiciary and Foreign Affairs Committee, the statute's use of the term serious harm "refers to a broad array of harms, including both physical and nonphysical, and *is intended to be subjectively construed* in determining whether a particular type or certain degree of harm or coercion is sufficient to overcome a *particular victim's* will."  154 Cong. Rec. H10,904 (daily ed. Dec. 10, 2008) (statement of Reps. Berman and Conyers) (emphases added).  Section 1589(c)(2) was added to "further clarif[y] these concepts to reflect the various and subtle forms of coercion used by traffickers" and "more fully capture the imbalance of power between trafficker and victim."  *Id.*

More broadly, Congress's factual findings preceding the substantive provisions of the TVPA make clear that the law intends to expand the scope of conduct that constitutes human trafficking beyond what was previously criminalized.  *See United States v. Callahan*, 801 F.3d 606, 618 (6th Cir. 2015).  Specifically, Congress explained that the TVPA *overruled* the Supreme Court's "narrow" holding in *United States v. Kozminski*, 487 U.S. 931 (1988)—i.e., that for

involuntary servitude to be illegal, it must be "brought about through use or threatened use of physical or legal coercion" and that the term does not encompass "other conduct that can have the same purpose and effect." Pub. L. No. 106-386, § 102(b)(13), 114 Stat. 1464, 1467; *accord United States v. Calimlim*, 538 F.3d 706, 712 (7th Cir. 2008); *see also* Reese, Note, *Holding on to Clarity*, 114 Mich. L. Rev. 275, 286 (2015). Accordingly, Congress found that federal anti-trafficking statutes "are intended to reach cases in which persons are held in a condition of servitude through nonviolent coercion." *Id.*; *see also* H.R. Conf. Rep. No. 106-939, at 101; Kim, *The Coercion of Trafficked Workers*, 96 Iowa L. Rev. 409, 438 (2011). For example, Congress intended the TVPA to criminalize the conduct of "[t]raffickers [who] … lure women with false promises of earning money overseas as maids [or] factory workers … [and] then use tactics including … psychological abuse to hold victims … in forced labor as among other things … domestic servants." H.R. Rep. No. 106-487, at 15 (1999).[8]

---

[8]    As Senator Marco Rubio explained in an amicus brief he filed in *Cruz v. Maypa*, 773 F.3d 138 (4th Cir. 2014):

Congress sought to protect victims from exactly the type of grave abuses at issue in this case, namely … bring[ing] foreign nationals to the United States to serve as domestic workers under depraved conditions constituting involuntary servitude and forced labor. … [T]he text and legislative history of the TVPA and its reauthorizations demonstrate that Congress, from the outset, was also concerned about the plight of domestic workers … [and] rejected narrower measures

- 25 -

This Court has not directly addressed the scope of § 1589.  The only Fourth Circuit decision to even cite 18 U.S.C. § 1589 dealt with a procedural statute of limitations issue.  *See Cruz v. Maypa*, 773 F.3d 138, 143-146 (4th Cir. 2014).  Notably, however, its facts were very close to this case.  The *Cruz* plaintiff was lured to the United States with the promise of reasonable pay and working hours.  *Id.* at 142.  Upon arrival, she was required to work punishingly long hours for unlawfully low pay with no time off, kept isolated from the outside world, and freed only after she "contacted a friend living in the United States" who helped her plan her escape.  *Id.*; *see also id.* at 146 ("Cruz … alleged that the defendants confiscated her passport, isolated her from other people, monitored her communications, and threatened that she would be imprisoned and deported if she tried to escape.").  Significantly, this Court implied that Cruz would have a viable TVPA claim if the district court concluded on remand that her case was not time-barred.  *Id.* at 141, 147.

Unlike the district court in this case, the four Circuits to address the issue presented (following the enactment of § 1589(c)(2)) have followed Congress's

_____

focused solely on sexual exploitation in favor of a comprehensive anti-trafficking bill that addressed the plight of forced laborers.

Brief for Amicus Curiae Senator Marco Rubio at 3-4 (Dkt. 19); *see also United States v. Toviave*, 761 F.3d 623, 630 (6th Cir. 2014) (describing the typical § 1589 scenario as involving "victims who were brought to the United States to work and who were subsequently cheated out of the salaries they were promised all while being subjected to intolerable living conditions").

clear instructions by analyzing how an individual in the victim's shoes would have viewed the Defendant's conduct when evaluating whether the victim was coerced via serious harm.  In *United States v. Dann*, 652 F.3d 1160 (9th Cir. 2011), the Ninth Circuit held that the fact finder must "ask whether, from the vantage point of an immigrant in [the victim's] position," the circumstances "taken together … compel[led] her to remain in [Defendants'] employ."  *Id.* at 1171.  In *United States v. Rivera*, 799 F.3d 180, 185, 187 n.5 (2d Cir. 2015), the Second Circuit explained that the "forced labor statute[] … require[s] an analysis of 'all the surrounding circumstances'" when determining whether a "reasonable person" would have felt coerced.  The Tenth Circuit in *United States v. Kalu*, 791 F.3d 1194, 1212 (10th Cir. 2015), has noted that, in the context of foreign national victims, the § 1589 analysis encompasses "threat[s of]," for example, "revocation of their visas, deportation, and financial ruin," because "[t]hese are precisely the types of threats that could 'compel a reasonable person of the same background and in the same circumstances'" to work for Defendants.  And the Third Circuit has recognized that § 1589 is "intended to be construed with respect to the individual circumstances of victims that are relevant in determining whether a particular type or certain degree of harm or coercion" forced the victim to work.  *United States v. Afolabi*, 508 F. App'x 111, 117 (3d Cir. 2013).  District courts in this Circuit have applied the same test, citing § 1589(c)(2)'s clear text.  *See, e.g.*, *Elat v. Ngoubene*, 993 F.

Supp. 2d 497, 526 (D. Md. 2014); *Antonatos v. Waraich*, No. 12-cv-01905, 2013 WL 4523792, at *4-5 (D.S.C. Aug. 27, 2013).

In fact, Appellant is aware of no case that has read § 1589's serious harm prong as narrowly as the district court did below. For example, the First Circuit held—in a decision that predated § 1589(c)(2)—that a jury is entitled to consider "known objective conditions that make [a] victim especially vulnerable to pressure," such as "immigrant status" and "lack of local ties" when determining whether he or she was required to work against their will. *United States v. Bradley*, 390 F.3d 145, 152-153 (1st Cir. 2004), *judgment vacated on other grounds*, 545 U.S. 1101 (2005). The Seventh Circuit similarly recognized that § 1589 "expanded the definition of involuntary servitude to include nonphysical forms of coercion" and that there need not be "threats of violence or physical coercion" to the victim for § 1589 to be violated. *Calimlim*, 538 F.3d at 714; *cf. United States v. Farrell*, 563 F.3d 364, 373-374 (8th Cir. 2009) (interpreting 18 U.S.C. § 1581 to require consideration of a victim's "special vulnerabilities").

**B.    The District Court Erred By Reciting And Applying An Incorrect Legal Test For Determining Whether Ms. Muchira Suffered, Or Faced Threats Of, Serious Harm**

The district court erred by inventing its own test for assessing whether Ms. Muchira suffered "serious harm" and applying it in a manner that ignored plaintiff's special vulnerabilities. The court's approach diverged from the plain text

of § 1589(c)(2), the unequivocal statements of Congress in enacting that statute, and from the approach taken by the rest of the Circuits and district courts in this Circuit.[9]

1.      The district court announced a new (and erroneous) test for liability under § 1589.  Rather than consider whether Ms. Muchira suffered from "any harm … including psychological, financial or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances" to labor for Defendants, 18 U.S.C. § 1589(c)(2), the district court announced that the "critical inquiry" is whether a victim provides her labor "free from a defendant's physical or psychological coercion that as a practical matter eliminates the ability to exercise free will or choice," JA1045.  The district court refused to consider whether a person in Ms. Muchira's shoes would have felt compelled to continue working for Defendants.  Instead, it approached its inquiry from the perspective of an average American-born and educated individual.  To support this flawed analysis, the only authority the district court cited was *United States v. Booker*, 655 F.2d 562 (4th Cir. 1981), a case in which this Court explained that the "generally accepted definition" of a *slave* is "a person who is wholly subject to the will of another, one

---

[9]      This Court applies "de novo review to the district court's legal determinations."  *See Maersk Line, Ltd. v. United States*, 513 F.3d 418, 421 (4th Cir. 2008).

who has no freedom of action and whose person and services are wholly under the control of another," *id.* at 566 (internal quotation marks omitted).

*Booker* is doubly inapposite. *First*, *Booker* predates the TVPA by nearly twenty years and Congress's specific definition of "serious harm" in § 1589(c)(2) by nearly thirty years. Indeed, this Court has not even cited the *Booker* decision since 1983. *Second*, *Booker* involved a *different* statute with a *different* standard. *Booker* discussed 18 U.S.C. § 1583, which deals with *slavery*, not forced labor. Appellant is not aware of *any* other court that has cited *Booker* when interpreting § 1589. Even Defendants, who cited *Booker* in their motion for summary judgment, did not suggest that *Booker* has any applicability to § 1589. Instead, they referred to it only for the proposition that *an entirely different statute*—18 U.S.C. § 1584—was, along with § 1583, enacted "to enforce the Thirteenth Amendment." Dkt. 126 at 17.

Relatedly, in creating its new legal test, the district court failed to adequately grapple with the other Circuits that have considered the special vulnerabilities of the victim in determining liability under the federal anti-human trafficking statutes. For example, the court distinguished away the *Bradley* and *Farrell* cases on their facts in a brief footnote, without addressing the legal rule upon which the First and the Eighth Circuits relied. JA1049 n.26. And the district court did not even mention the other cases Ms. Muchira cited in her briefing that underscore the

expansive conception of forced labor embodied in § 1589. *See* Dkt. 134 at 10-11 (citing *Calimlim* and *Dann*). The district court thus took the first step towards creating a circuit split between this Court and the Ninth and Seventh Circuits without articulating a reason for doing so.

**2.** The district court's application of its erroneous and novel test clearly led it to reach the wrong result. The court faulted Ms. Muchira for failing to provide "*objective* evidence [of] the 'serious harm' she experienced or feared that forced her against her will to remain in Defendants' home and service," JA1046 (emphasis added), a statement that reflects a lack of understanding of § 1589(c)(2)'s requirement that the factfinder conduct the "serious harm" analysis from the perspective of the victim. *See supra* pp. 23-24, 26-28.

This sentiment is apparent throughout the decision. To take one example, the district court found (once again conflating the language of § 1584 and § 1589) that the evidence regarding Ms. Muchira's "duties [and] the circumstances under which she was required to perform them does not allow *any reasonable inference* that she was held to involuntary servitude," JA1045 (emphasis added), but the court's subsequent analysis made no consideration of whether it would have been reasonable for *someone in Ms. Muchira's circumstances* to believe herself unable to leave Defendants' employ. The district court did not consider, for example, whether a recent arrival to the United States would have a more difficult time

leaving the employ of the only people that she knew in the country, the people who had confiscated her passport—and whom the terms of her visa required her to work for or face deportation—or whether Defendants took advantage of these facts in making her work incredibly long days without rest or vacation for less than $1 an hour.  To be sure, the average American would not have tolerated such working conditions; the fact that Ms. Muchira did is indicative of the fact that she believed she had no other option or, at a minimum, that the jury could have reasonably come to that conclusion.[10]

Similarly, the district court found that there was "insufficient evidence to establish that [Ms. Muchira] felt unable to terminate her employment because of the house rules" imposed by Defendants, such as not being permitted to speak to the neighbors or leave the house unaccompanied.  *See* JA1047 n.24.  But as explained above and in Ms. Muchira's opposition to summary judgment, the effect of Defendants' house rules must be understood in the context of their horrific treatment of her in Saudi Arabia (such as giving her so little food that she ate out of the garbage to keep herself from starving).  *See supra* pp. 1, 5-6; Dkt. 134 at 3; *see*

---

[10]     The district court incorrectly suggested—without citation—that *all* of the "term[s and] condition[s]" of Ms. Muchira's employment were "disclosed to or understood by her before agreeing to come to the United States."  JA1045-1046. That is indisputably wrong—for example, no one told Ms. Muchira that she would be working nearly one-hundred-hour weeks rather than the forty-hour weeks called for in her contract.  *See supra* pp. 6-7.

*also* JA932 ¶ 30.  While an average American may not have felt bound by Defendants' house rules, Ms. Muchira's behavior must be considered in light of all the surrounding circumstances, including her employment history with Defendants.

Moreover, the district court implicitly adopted an interpretation of "serious harm" that excluded many forms of psychological harm, in contravention of § 1589(c)(2).  For example, the district court discounted without explanation the evidence that Defendants' house rules that "led to a sense of isolation, vulnerability and dependency that prevented [Muchira] from exercising her free will" constituted "serious harm."  JA1044-1045; *see infra* pp. 41-47 (discussing this evidence).  Similarly, while the district court acknowledged and apparently factored in the negative physical effects of Ms. Muchira's eight months with Defendants—such as the fact that she dislocated her back while on the job and was denied medical treatment despite substantial pain, JA1045 & n.22—it made no reference to the fact that Defendants' psychological abuse of Ms. Muchira was sufficiently severe that she was subsequently diagnosed with a major depressive disorder and Acute Stress Disorder with Panic Attacks, *see supra* p. 10; Dkt. 134 at 5, 19.

The district court's failure to apply the proper test in this case is particularly stark when compared to the ruling in another recent TVPA case from a district court in this Circuit.  In *Elat v. Ngoubene*, the court recognized that whether a

Defendant's *single* mention of deportation in a conversation with the domestic

employee Plaintiff that occurred only once during a two-year employment

relationship constituted a threat of "serious harm" could not be quickly dismissed

as insufficient to support a § 1589 claim. *See* 993 F. Supp. 2d at 523-527. Instead,

this question required considering the totality of the circumstances surrounding the

comment, after which the court concluded that a "jury reasonably could find that 'a

reasonable person of [Plaintiff's] background and in [her] circumstances would

believe" the statement to be a threat and feel compelled to continue to work for

Defendants. *Id.* at 527. The *Elat* court also concluded that the evidence that the

Plaintiff had left her employer's home "on various occasions and returned"—going

unaccompanied to places such as GED classes, first communion classes, and the

mall—did not demonstrate that she was working for Defendants voluntarily

because the Plaintiff frequently "followed the directions of adult authority figures

… without question" and may not have "understood that she had any option" but to

continue working for Defendants. *Id.* at 530-531; *cf.* JA1046 n.24 (indicating that

Ms. Muchira might have had a similar belief in following the guidance of authority

figures but suggesting that this rendered her labor voluntary).[11]

---

[11] Notably, the *Elat* Plaintiff had similar characteristics to Ms. Muchira. *E.g.*, 993 F. Supp. 2d at 529 (highlighting that Plaintiff was "a recent arrival to the United States … who spoke little [English] and knew only her [employers]," and who "lacked a high school education and depended on her [employers] for her shelter, food, clothes, and legal status" (internal quotation marks omitted)); *id.* at

**C.    Under The Proper Legal Standard, Ms. Muchira's § 1589 Claims, And Those Claims Dependent On A § 1589 Violation, Survive Summary Judgment**

Under the proper test, Ms. Muchira presented more than sufficient evidence to establish a question of material fact regarding whether Defendants' treatment of her constituted threats of, or led her to suffer, serious harm.  *See infra* p. 40 (discussing summary judgment standard).  Ms. Muchira, as well as Ms. Ngigi, Detective Woolf, Ms. Victoria Hougham (Muchira's social worker), and Ms. Muchira's experts presented evidence that Defendant's collective conditioning of Ms. Muchira while she was working as a "housegirl" in Saudi Arabia and in the United States led her to fear what would happen if she disobeyed Defendants' rules while in the United States.  *See* 18 U.S.C. § 1589(a)(2), (4).

For example, Ms. Muchira testified repeatedly that she was unable to leave the house alone or talk to anyone in Defendants' neighborhood under the rules that Defendants had laid down during her many months of employment in Saudi Arabia.  JA313-322.  "[T]he rules for the [Defendant's] house," she has explained, "go back to Saudi Arabia."  JA314:12-15.  It was there that she learned that she was not permitted "to go out without [being] accompanied by somebody" or even "to talk to anybody" who lived in Defendants' neighborhood.  JA314; JA322.

---

529 n.15 (observing that the Plaintiff "routinely contacted people outside [of her employers'] home, in Cameroon and the United States, through [her] own cell phone and e-mail, and Defendants did not limit her Internet access").

Defendants' words and actions convinced her that the same rules applied in the United States. *See generally supra* pp. 1, 8. For instance, the family required her to perform her only chore that took her outside of the house—taking out the garbage—at a time when one family member could watch her to ensure she promptly returned. JA936-937 ¶ 50. And when the family lived in the apartment complex, they would call Ms. Muchira each night to ensure she was there. *See supra* p. 8.

Defendants used a variety of other techniques to keep Ms. Muchira under their sway and to reinforce her status (in their eyes and in her own) as an inferior human being. For example, they conceded before the district court that they had possession of Ms. Muchira's passport during the eight months she served as their housemaid in the United States. JA100-101 ¶¶ 73-84. And Ms. Muchira testified that she did not wish for Defendants to maintain control of her passport, but was conditioned to believe that she had no choice. *E.g.*, JA236:10-237:3 ("[T]he first time I went to Saudi Arabia … [Defendants] took my passport. … When we came to America, the same thing happen[ed], they take my passport."); JA237:15-18 ("I never asked [Defendants] to keep the passport. They are the one[s] who took it."); JA238:7-12 ("They asked for [it] … and I give it to them."). Not only did Ms. Muchira believe that she could not leave the house without her passport, JA 237:15-240:16, but her lack of a passport meant that—as an immigrant with no ties

to the United States—she had no other proof of identity that would help her prove
who she was to the proper authorities.[12]

The negligible compensation provided by Defendants also reinforced Ms.
Muchira's status as an inferior. She received a salary of less than $1 an hour but
kept none of it; she "sen[t] all of [her] pay to Kenya" to help her family afford her
things like her younger "siblings' tuition and books" and her mother's hospital
bills. JA938 ¶ 57; JA304. As a result, she relied entirely on Defendants to provide
her with food and lodging (as per their contractual arrangement). Ms. Muchira
explained that Defendants took advantage of her dependence by assigning her a
small basement room with a tiny bed and no heat for five months of her
employment, after which Defendants bought her a space heater. JA938 ¶ 55; *see
also* JA938 ¶ 56 (noting that when Defendants "went out for the day during the
winter, they turned off the heat in the house" and let the house get so cold that Ms.
Muchira had to wear a "coat until they returned").[13] That Ms. Muchira did not

---

[12]    Defendants may assert, as they did below, Dkt. 126 at 19, that Ms. Muchira
"was frequently given her passport back," but in fact, Ms. Muchira testified that
she only held her passport under two circumstances: (1) her arrival in the United
States, where she was given her passport to go through security/passport control at
Dulles airport, and (2) her occasional trips with Defendants to transfer her meager
earnings home to her family, JA238:1-19.

[13]    As noted above, Defendants moved Ms. Muchira to the basement room after
permitting her to sleep in a separate (but nearby) apartment in a small apartment
complex for a fairly short period of time. *See supra* p. 37.

leave Defendants' illegal and degrading employ is in itself strong evidence that she believed she had no ability to do so.

Ms. Muchira's testimony regarding her treatment and the coercive effects it had on her was corroborated by her additional witnesses. Ms. Muchira's human trafficking expert, Ms. Florence Burke, explained that rules like Defendants' that subject the victim to isolation and restrict her communications (coupled with the pressures created by verbal abuse and illegally long hours) are common in trafficking cases. JA971-973. These factors help create a pervasive climate of fear that discourages escapes. *Id.* This conclusion is buttressed by Detective Woolf's testimony that when he arrived to rescue Ms. Muchira, she was unwilling to leave Defendants' home until he promised her that she would not be arrested for fleeing. JA809-810. Indeed, Ms. Muchira lived in such great fear of Defendants that, before she fled, she prepared the house for Defendants' return (e.g., taking out the garbage, folding the dry laundry) so they would not be as angry when they returned. *Id.*; JA943 ¶¶ 75-76. Detective Woolf testified that, in his experience, this is common in trafficking situations. JA810. And Ms. Hougham and Ms. Ngigi similarly explained that Ms. Muchira was terrified to escape from Defendants' home for fear of what they and the authorities would do to her. JA979:5-14; JA980:14-19; JA981:12-982:4; JA983:20-984:18; JA883:7-10; JA876:1-877:18; JA988 ¶ 24. Under the proper legal test—considering Ms.

Muchira's vulnerability as a newly arrived immigrant with no ties to the United States and who had been subject to Defendants' poor treatment for nearly two years while in Saudi Arabia—this evidence was more than sufficient to preclude summary judgment. *See infra* pp. 41-47.

The district court dismissed Ms. Muchira's 18 U.S.C. §§ 1590, 1592, 1593A, and 1595 claims solely because it concluded that Ms. Muchira's § 1589 claim—a predicate for the other four—could not survive summary judgment. *See* JA1049-1050. Accordingly, the district court's rulings on those claims should be reversed as well.

## II. THE DISTRICT COURT MISAPPLIED THE SUMMARY JUDGMENT STANDARD BY WEIGHING THE EVIDENCE AND FAILING TO ANALYZE THE FACTS IN THE LIGHT MOST FAVORABLE TO MS. MUCHIRA

The district court also erroneously decided contested factual issues and failed to view the facts in the light most favorable to Ms. Muchira when evaluating her 18 U.S.C. § 1589 claim. This alone is sufficient to require reversal of its summary judgment ruling. *See, e.g.*, *Jacobs v. North Carolina Admin. Office of Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 155 (4th Cir. 2012).

### A. The Procedural Posture Of This Case Required The District Court To View The Facts In The Light Most Favorable To Ms. Muchira And Avoid Weighing The Evidence

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "'[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor'" when adjudicating a motion for summary judgment. *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (per curiam) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Liberty Lobby*, 477 U.S. at 255. The Fourth Circuit reviews a district court's grant of summary judgment de novo. *McAirlands, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 309-310 (4th Cir. 2014).

### B. The District Court Failed To Apply The Proper Standard; It Improperly Decided Factual Issues And Failed To Weigh The Evidence In The Light Most Favorable To Ms. Muchira

The district court's summary judgment decision hinged on improper determinations of three material facts central to Ms. Muchira's § 1589 claims, any one of which is sufficient to warrant reversal. If the court had applied the proper summary judgment standard, it would have concluded that there was a genuine issue of material facts as to whether Defendants (A) used psychological coercion

and (B) the implicit threat of arrest to secure her continued employment, as well as (C) whether Defendants abused the legal process to acquire and keep her services.

**1.    Ms. Muchira presented evidence showing that she continued working for Defendants due to serious harm in the form of psychological coercion**

The district court found that, even viewing the facts in the light most favorable to Ms. Muchira, Defendants did not use psychological harm as a means of keeping her under their control. JA1044-1048, 1051. Based on this finding, the court concluded that Ms. Muchira had failed to create a genuine issue of material fact that Defendants had forced her to work for them using serious harm in the form of, among other things, a set of "house rules" that forbid her from leaving the home unaccompanied or talking to neighbors and day-to-day treatment so abusive that it caused her to develop mental illnesses. JA1049. The court could not have granted summary judgment on Ms. Muchira's § 1589 claim if it had not improperly discounted this evidence.

Specifically, the district court held with little explanation that the evidence that Defendants had effectively placed Ms. Muchira in a psychological prison was "insufficient as a matter of law," JA1044, for her § 1589 claim. The court incorrectly stated that there was no evidence that Ms. Muchira's continued employment was anything but "volitional," and emphasized that Ms. Muchira failed to produce evidence that Defendants "threatened her with any consequences

if she terminated her employment." JA1044, 1046. To the contrary, there was record evidence that Defendants (1) had conditioned Ms. Muchira in Saudi Arabia to fear the consequences of disobeying them, JA929-933 ¶¶ 16-34; JA236:5-237:14; JA240:17-241:6; JA313:5-322:22, (2) forbidden Ms. Muchira from leaving their home unaccompanied, JA937 ¶ 52; JA244:11-247:3; JA316:8-18; JA317:4-9; JA318:20-319:4; JA321:4-8; JA321:12-19, (3) barred Ms. Muchira from talking to anyone in the neighborhood , JA313:18-314:3, (4) denied her possession of her passport, JA938 ¶ 58; JA235:7-238:19; JA100-101 ¶¶ 73, 83, (5) paid her an average wage of less than $1.00 an hour, *see* JA937 ¶ 53; JA304:9-11, and (6) treated her so poorly that Ms. Muchira had difficulty sleeping, often cried herself to sleep, and developed Acute Stress Disorder with Panic Attacks and a major depressive disorder after working for Defendants, JA939-940 ¶¶ 61-63; JA991-994; JA823:6-824:13; *see also infra* pp. 10, 33. Ms. Muchira also testified that Defendants set up an alarm system in their Vienna, Virginia home that was turned on whenever they left. JA324:2-20; *supra* pp. 8-9. Ms. Muchira knew that if the alarm went off, Defendants would be alerted that she had left the house; the alarm functioned "like their lock," keeping her trapped within the house in their absence. JA324:2-20; *supra* pp. 8-9. Defendants never provided Ms. Muchira with the alarm code and instructed her not to "touch the alarm" while they were away. JA325:5-9; *see supra* pp. 8-9.

- 42 -

If the court had viewed this evidence properly under Rule 56—rather than ignoring or discounting it with inadequate explanation—it would have found at the very least a triable question of fact as to whether Defendants obtained Ms. Muchira's continued labor through serious harm for the purposes of her § 1589 claim.

The district court's finding that Ms. Muchira was able to leave Defendants' residence unaccompanied is illustrative of the errors in the district court's summary judgment decision.  *See* JA1051.  Ms. Muchira *testified* that she *never* left Defendants' residence unaccompanied in her eight months working for them—"not even one day."  *See* JA307:8-10.  The district court discounted this testimony entirely, concluding that "there were occasions when she was outside of the Defendants' home unaccompanied by Defendants."  JA1051.  But its only support for this point was two minor incidents that, when examined, are hardly evidence that Ms. Muchira left Defendants' control.  *Id.*  In other words, the district court drew inferences in favor of Defendants and thus misapplied the summary judgment standard.

*First*, the court referenced the fact that Ms. Muchira testified that—when she lived in an apartment complex with Defendants—she went "jogging" "[two] or three times."  *See* JA307:12-308:21; JA415:3-6.  However, Ms. Muchira made clear during her deposition that she used the term "jogging" to mean walking

around a parking lot *enclosed in the apartment complex*. JA308:7-309:4. She

never left the grounds of Defendants' apartment complex during these "jogs"; she

accessed the parking lot through a stairwell also located inside the complex.

JA308:9-13; JA308:15-21; JA309:2-4; JA415:9-10. Given the procedural posture

of this case, the proper inference to draw is that Ms. Muchira felt so trapped that

she could not bring herself to leave the grounds of Defendants' apartment building

even when exercising (and not, as the court concluded, that she freely left

Defendants' home unaccompanied). JA1051.

     *Second*, the court cited Ms. Muchira's testimony discussing a single trip to a

mall with Defendants. JA1051. Specifically, Ms. Muchira testified that she

accompanied Defendants to a Georgetown mall with an ice rink, where she was

permitted to watch the skaters while Defendants shopped nearby. JA311:5-312:8.

But in direct contradiction to the district court's factual finding, the record shows

that Ms. Muchira was never alone during this trip. She was driven to and from the

rink by Defendants and she remained within their watchful line of sight. *Id.*

Indeed, contrary to the district court's factual determination, the evidence it cited

emphasizes the complete control that Defendants had over Ms. Muchira's life.

That the "jogging" and "ice rink" incidents were the *only* examples that either

Defendants or the court could cite for the proposition that Ms. Muchira left the

house unaccompanied during her nearly a year of "working" for Defendants

underscores how little evidence was available to support the court's unwarranted factual finding.

The court's conclusion that Ms. Muchira did in fact leave Defendants' home unaccompanied was crucial to its decision to grant summary judgment on Ms. Muchira's § 1589 claim. Specifically, the court found Ms. Muchira's evidence "insufficient as a matter of law" because the evidence did not allow "any reasonable inference that she was held to involuntary servitude." JA1044-1045.[14] But the facts—especially if viewed in the light most favorable to Ms. Muchira— show that she had never left Defendants' residence unaccompanied and therefore felt herself *unable* to leave their employ due to Defendants' psychological abuse. A reasonable jury could also have found that psychological harm led her to continue working for Defendants against her will.

### 2.    Ms. Muchira put forth evidence that she continued working for Defendants due to their implicit threat she would be arrested if she left

The district court concluded that Ms. Muchira failed to show that Defendants had used fear of arrest as a tool to prevent her from leaving their residence. JA1048. In light of that finding, which misapplied the summary judgment standard, the court found Ms. Muchira had not created a genuine

---

[14]    This point was also important for her false imprisonment claim. There, the court found that there was "no evidence" that Defendants threatened Ms. Muchira with any words or acts "that would cause her to believe that she would be physically restrained if she attempted to leave." JA1052.

question of material fact that Defendants used threats of serious harm to compel her to work for them. JA1049. If the court had instead properly found that Ms. Muchira did raise a genuine question of material fact on this point, then it could not have granted summary judgment on her § 1589 claim.

However, Ms. Muchira offered substantial evidence that Defendants effectively prevented her from leaving their control via an implicit threat of arrest if she did so. First, Ms. Muchira explained that she believed that if she left Defendants' home without her passport, she would be arrested. *See* JA237:15-240:16; *see also supra* pp. 19, 36. Detective Woolf corroborated Ms. Muchira's testimony on this point. JA809:13-810:6. Second, there was ample evidence to support the conclusion that Ms. Muchira did not have control of her passport the entire time she worked for Defendants. Defendant Al-Rawaf took control of Ms. Muchira's passport as soon as she passed passport control at Dulles airport and she and the other Defendants possessed Ms. Muchira's passport until after her escape. JA926 ¶ 4; JA936 ¶ 48; JA 938 ¶ 58; *see also* JA100-101 ¶¶ 73, 83 (Defendants conceding that it was undisputed that Al-Rawaf had possession of Ms. Muchira's passport "when [Muchira] was working for her" and that the passport was "in Fahad Al[-R]ashoudi's bedroom less than two weeks before" Ms. Muchira's escape); *see also supra* n.12. Nor did Ms. Muchira believe she was allowed to possess her passport in the first place: based on her treatment in Saudi Arabia, she

had come to expect that Defendants would not let her keep it.  JA236:10-237:3;

JA240:17-241:3; *see also supra* p. 36.

The district court discounted this favorable evidence—or at best, weighed it

and came out in Defendants' favor.  The court emphasized that Ms. Muchira

offered no evidence that Defendants "*explicitly*" threatened to have her arrested,

JA1044, 1048 (emphasis added), effectively acknowledging that there was

evidence of such implicit threats.  A reasonable jury, in any event, could have

found that Defendants knew Ms. Muchira was afraid to leave the house without her

passport—especially since they also had deprived Ms. Muchira of her passport in

Saudi Arabia, *see supra* p. 36—and that their exclusive possession of her passport

coerced her continued employment.  In other words, reading this evidence in the

light most favorable to Ms. Muchira, a jury could easily have found that

Defendants' behavior was, at a minimum, essentially a threat of arrest.  On this

basis, a jury could find that Ms. Muchira had raised a genuine dispute as to a

material fact central to her § 1589 claim.

### 3.    Ms. Muchira put forth evidence showing that Defendants procured her labor through abuse of the visa process

Finally, the district court found that, even taking the facts in the light most

favorable to Ms. Muchira, she failed to establish that Defendants compelled her to

work for them through abuse and manipulation of the visa process.  JA1048-1049.

Accordingly, the district court held that Ms. Muchira failed to establish that there

was a genuine question of material fact regarding whether Defendants kept her under their control via "abuse of law or legal process." JA1049. If the court had properly applied the summary judgment standard, it would have found that there was a genuine question of material fact as to whether Defendants compelled Ms. Muchira to work for them through abuse of legal process, and could not have granted summary judgment on Ms. Muchira's § 1589 claim.

In fact, Ms. Muchira introduced ample evidence that Defendants obtained her services by falsely representing to United States government officials that she would be employed under legal pay and working conditions, in violation of 18 U.S.C. § 1589(a)(3). The district judge erred by discounting this evidence and by doing so with essentially no analysis. JA1049.

There is no dispute that in June or July 2012, Defendants scheduled an appointment for Ms. Muchira at the Embassy of the United States in Riyadh, Saudi Arabia, as part of the process by which Ms. Muchira could obtain a B1 visa to accompany them to the United States to work. JA82 ¶ 17. Defendants accompanied Ms. Muchira to her appointment at the U.S. Embassy in Riyadh, and—in order to convince embassy officials to allow her into the country— represented that Ms. Muchira would be compensated in accordance with the terms of her employment contract and that her employment would be consistent with U.S. laws. *Id. ¶¶* 19-20.

The contract presented to immigration officials represented that Ms. Muchira: (1) would be paid $1,600 per month for a forty-hour work with overtime wages of $15 per hour if she worked more than 40 hours per week; (2) would be free to leave Defendants' residence after working hours; and (3) would be treated in a fair and humane way. *See supra* pp. 6-7.

Ms. Muchira presented evidence that Defendants directed her to lie to U.S. embassy officials, telling them that she would be paid $1,600 per month although she would only be paid $400 per month. JA1032; JA167-169. As a result of these representations, the United States issued Ms. Muchira a B1 visa to accompany Defendant Al-Rawaf to the United States for six months. JA82 ¶ 21.

In December 2012, Defendants directed Ms. Muchira to sign a second contract for employment that would allow her visa to be extended and then submitted the paperwork for the extension. JA939 ¶ 60; JA220:16-221:7; JA229:7-232:9. This contract represented that Ms. Muchira: (1) would be paid $1,600 per month for a forty-hour work week with overtime wages of $40 per hour if she worked more than 40 hours per week; (2) would be free to leave Defendants' home during non-work hours; and (3) would be provided room and board at no cost. JA951-952. The United States government renewed Ms. Muchira's visa.

The district court held that the evidence was "insufficient as a matter of law to establish any conduct that meets the [§ 1589(c)(1)] definition of" abuse of law

or legal process.  But a reasonable jury could undoubtedly infer from Ms. Muchira's evidence that Defendants never intended to comply with the terms of Ms. Muchira's contracts, and yet represented that they would in order to procure a visa for Ms. Muchira to serve as their housemaid in the United States.  Defendants kept no records of Ms. Muchira's work hours, JA82-83 ¶¶ 26-29, and presented only a one-page "pay chart" Ms. Muchira was directed by Defendants to sign as evidence that she was paid $1,600 per month, JA104 ¶ 100.  And the evidence in the record, viewed in the light most favorable to Ms. Muchira, shows that she was paid no more than $3,520 for working 15-hour days, 7 days per week—i.e., less than $1 per hour.  JA937 ¶ 53; JA945-955 ¶ 88.  In other words, the record evidence shows that Defendants convinced Ms. Muchira to accept an abusively low wage by telling her that she was entitled to no more because they were providing her a place to sleep, food, and clothing.  JA352:17-353:17.  Viewing this evidence in the light most favorable to Ms. Muchira, a reasonable jury could undoubtedly conclude that Defendants abused the visa process to extract housemaid services from Ms. Muchira for less than $1 an hour.

## CONCLUSION

The district court's judgment should be reversed and the case should be remanded for trial.

Respectfully submitted.

/s/ Gregory H. Lantier
JAMES L. QUARLES, III
GREGORY H. LANTIER
ROBERT ARCAMONA
THOMAS G. SPRANKLING
WILMER CUTLER PICKERING
 HALE AND DORR LLP
1875 Pennsylvania Avenue N.W.
Washington, D.C.  20006
(202) 663-6000

December 11, 2015

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) in that, according to the word-count feature of the word-processing system in which it was prepared, the brief contains 12,243 words, excluding the portions exempted by Rule 32(a)(7)(B)(iii).

/s/ Gregory H. Lantier
GREGORY H. LANTIER

# CERTIFICATE OF SERVICE

On this 11th day of December 2015, I electronically filed the foregoing brief using the Court's CM/ECF system.  Participants who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ Gregory H. Lantier
GREGORY H. LANTIER

# ADDENDUM

## TABLE OF CONTENTS

Page

18 U.S.C. § 1589 ....................................................................... 1a

18 U.S.C. § 1595(a) ................................................................. 2a

**18 U.S.C. § 1589.    Forced labor**

**(a)**    Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—

**(1)**    by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

**(2)**    by means of serious harm or threats of serious harm to that person or another person;

**(3)**    by means of the abuse or threatened abuse of law or legal process; or

**(4)**    by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,

shall be punished as provided under subsection (d).

**(b)**    Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

**(c)**    In this section:

**(1)**    The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

**(2)**    The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

**(d)**    Whoever violates this section shall be fined under this title, imprisoned not more than 20 years, or both.  If death results from a violation of this section, or if the violation includes kidnaping, an attempt to kidnap, aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title, imprisoned for any term of years or life, or both.

## 18 U.S.C. § 1595.    Civil remedy

**(a)**    An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

*    *    *